# Attachment to Notice of Motion: Brief of *Amici* in Support of City of Emeryville's Motion for Summary Judgment

1    PAUL K. SONN
     JENNIFER SUNG
2    BRENNAN CENTER FOR JUSTICE
       AT NYU SCHOOL OF LAW
3    161 Avenue of the Americas, 12th floor
     New York, NY 10013
4    Telephone: (212) 998-6328
     Facsimile: (212) 995-4550
5
     ANDREW J. KAHN #129776
6    DAVIS, COWELL & BOWE, LLP
     595 Market St., 14th Fl.
7    San Francisco, California 94105
     Telephone: (415) 597-7200
8    Facsimile: (415) 597-7201

9    Attorneys for *Amici*

10                        UNITED STATES DISTRICT COURT

11                       NORTHERN DISTRICT OF CALIFORNIA

12

13   WOODFIN SUITE HOTELS, LLC et al        )    CASE NO. C06 1254
                                            )
14           Plaintiffs,                     )    **BRIEF OF *AMICI* IN SUPPORT OF CITY OF**
                                            )    **EMERYVILLE'S MOTION FOR SUMMARY**
15                                           )    **JUDGMENT**
     vs.                                     )
16                                           )    DATE:    December 5, 2006
     CITY OF EMERYVILLE,                      )    TIME:    1:00 p.m.
17                                           )    Courtroom 3, Oakland
             Defendant                       )    Hon. Saundra B. Armstrong
18   _____)

19

20

21

22

23

24

25

26

27

# TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    MEASURE C DOES NOT VIOLATE EQUAL PROTECTION OR DUE PROCESS. . . 3

            1.    The Wage Requirements Reflect Compelling Public Policy and Hence Readily
                  Meet the Rational Basis Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            2.    Regulating Only Large Hotels Meets the Rational Basis Test. . . . . . . . . . . . . . . 9

            3.    There is a Rational Basis for Allowing Additional Flexibility to Collective
                  Bargaining Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            4.    A Workload Premium for Housekeepers Has a Rational Basis. . . . . . . . . . . . . 11

            5.    Worker Retention Readily Meets the Rational Basis Test. . . . . . . . . . . . . . . . . 12

            6.    There Is A Rational Basis for the Enforcement Provisions. . . . . . . . . . . . . . . . 12

      B.    MEASURE C IS NOT PREEMPTED BY FEDERAL LABOR LAWS. . . . . . . . . . . . . 13

            1.    Measure C is Not Preempted by the Machinists Doctrine. . . . . . . . . . . . . . . . . 13

            2.    The Garmon Doctrine Does Not Preempt Any Provision of Measure C. . . . . . . 18

            3.    Measure C Is Not Preempted by ERISA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      C.    MEASURE C IS NOT UNCONSTITUTIONALLY VAGUE. . . . . . . . . . . . . . . . . . . . 20

      D.    MEASURE C IS NOT PREEMPTED BY STATE LAWS. . . . . . . . . . . . . . . . . . . . . . 21

      E.    MEASURE C DOES NOT VIOLATE PRIVACY RIGHTS IN JOINING OTHER
            LABOR LEGISLATION IN PROVIDING OFFICIALS WITH PAYROLL ACCESS . . 24

      F.    THERE IS NO NEED FOR DISCOVERY HERE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

1

## TABLE OF AUTHORITIES

2

### CASES

3  Alaska Airlines v. Oregon Bureau of Labor,
      122 F.3d 812 (CA 9  1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4

5  Alcantara v. Allied Properties,
      334 F.Supp.2d 336 (EDNY 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6  Assoc'd Builders & Contractors v. Nunn,
      356 F.3d 979, 990 (CA 9 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7

8  Batiste v. Superior Court,
      4 Cal.App.4th 460 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

9  Burgio v. N.Y.S. Dep't of Labor,
      107 F.3d 1000 (CA 2 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

10

11  Burns Int. Sec. Svcs. Corp. v. County of L.A.,
      123 Cal.App.4th 162, 174-75 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12  Cal. Div. Lab. Standards Enft. v. Dillingham,
      519 US 316 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

13

14  Candid Enterprises v. Grossmont Union High School District,
      39 Cal.3d 878, 885 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15  Cedar Shake Bureau v. City of Los Angeles,
      997 F.2d 620 (CA 9 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

16

17  Central St. Univ. v. Amer. Assn of Univ. Profs.,
      526 U.S. 124, 128 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18  Chamber of Commerce v. Bragdon,
      64 F.3d 497, 504 (CA 9 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19

20  City of Baltimore v. Sitnick & Firey,
      255 A.2d 376 (Md. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

21  City of Columbia v. Omni Outdoor Advertising,
      499 U.S. 365, 377, 111 S. Ct. 1344, 1352 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

22

23  City of Santa Cruz v. Superior Ct.,
      40 Cal. App. 4th 1146 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

24  Colonnade Catering v. U.S.,
      397 US 72, 75-76 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

25

26

27

ii

28

County of Los Angeles v. Superior Court of Los Angeles County,
    13 Cal.3d 721, 726, 532 P.2d 495 (1975. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cranston v. City of Richmond,
    40 Cal.3d 755, 765 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Dillingham Const. v. County of Sonoma,
    190 F.3d 1034 (CA 9 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Duskin v. State Board of Dry Cleaners,
    58 Cal. 2d 155 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Etheridge v. Harbor House Restaurant,
    861 F.2d 1389 (CA 9 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Evangelatos v. Sup. Ct.,
    44 Cal.3d 1188, 1201 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

F.C.C v. Beach Communications, Inc.,
    508 U.S. 307, 313-314 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

Fisher v. City of Berkeley,
    37 Cal.3d 644, 707 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ft. Halifax Packing Co. v. Coyne,
    482 U.S. 1, 21 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

Gilbert v. City of San Jose,
    115 Cal. App.4th 606 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Goebel v. Elliott,
    35 P.2d 44, 45 (Wash. 1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Golden State Transit Corp. v. City of Los Angeles (II),
    493 U.S. 103 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Great Western Shows, Inc. v. County of Los Angeles,
    27 Cal.4th 853, 866 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Heller v. Doe,
    509 U.S 320 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Hoffman Estates v. Flipside, Hoffman Estates
    (1982) 455 U.S. 489, 497. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Holden v. Hardy,
    169 U.S. 366, 395-96, 18 S.Ct. 383, 388 (1898). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Cox,
    3 Cal.3d 205, 220 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iii

In re Marks,
    71 Cal.2d 31, 51 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Indus. Welfare Com. v. Superior Court,
    27 Cal.3d 690, 727, 729 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Int'l Paper Co. v. Town of Jay,
    928 F.2d 480, 485 (CA 1 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Katz v. Department of Motor Vehicles,
    32 Cal.App.3d 679, 684 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Keystone Chapter, Ass'd Builders & Contractors Inc. v. Foley,
    37 F.3d 945 (CA 3 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Lechmere, Inc. v. NLRB,
    502 U.S. 527, 532 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Legal Aid Society v. City of New York,
    114 F. Supp. 2d 204, 237 (SDNY 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Livadas v. Bradshaw,
    512 U.S. 107 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mason v. Office of Administrative Hearings,
    89 Cal.App.4th 1119, 1126-27 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Metropolitan Life Insurance Co. v. Massachusetts,
    471 U.S. 724, 755 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Minnesota Chapter of Associated Builders and Contractors, Inc.
    v. Minnesota Department of Labor and Industry, 47 F.3d 975 (CA 8 1995). . . . . . . . . . . . . . . . 19

National Broadcasting Co v. Bradshaw,
    70 F.3d 69, 73. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

Nickerson v. San Bernardino,
    179 Cal. 518, 522-524, 177 P. 465 (1918). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

NLRB v. Calkins,
    187 F.3d 1080 (CA 9 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

People v. Bigler,
    5 Cal. 23, 26 (1855). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

People v. Linwood,
    105 Cal.App.4th 59, 67-68 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Railway Express Agency v. New York,
    336 U.S. 106, 110 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ   CASE NO. C06 1254

Retail Industry Leaders Ass'n v. Fielder,
    Civ. No. JFM-06-316, 2006 WL 2007654 (D. Md. July 19, 2006)........................ 9

Rivera v. Division of Industrial Welfare,
    265 Cal.App.2d 576, 602-605 (1968). ............................................. 14

RUI v. City of Berkeley,
    357 F.3d 1137, 1154-56 (CA 9 2004). ..................................... 10, 15, 16

San Diego Building Trades v. Garmon,
    359 U.S. 236 (1959)............................................................ 18

Semore v. Pool,
    217 Cal.App.3d 1087, 1095 (1990). ............................................. 23

Sparks Nugget, Inc. v. N.L.R.B.,
    968 F.2d 991, 997 (CA 9 1992)................................................. 19

St. Thomas-St. John Hotel, Inc. v. Gov't of Virgin Islands,
    218 F.3d 232, 244-46 (CA 3 2000). ......................................... 11, 15,
    17

Sunset Amusement Co. v. Board of Police Commissioners,
    7 Cal.3d 64, 71-72 (1973). ..................................................... 21

Teamsters Local 856 v. Priceless, LLC,
    112 Cal.App.4th 1500 (2003). ................................................. 24

U.S. v. O'Brien,
    391 U.S. 367, 383 (1968)....................................................... 15

United States Railroad Retirement Board v. Fritz,
    449 U.S. 166, 179 (1980)........................................................ 9

Viceroy Gold Corp. v. Aubry,
    75 F.3d 482, 490-91 (CA 9 1996). ........................................ 9, 11, 17

Washington Service Contractors Ass'n v. District of Columbia,
    54 F.3d 811 (CADC 1995), cert den., 516 U.S. 1145 (1996). ................... 15

West Coast Hotel Co. v. Parrish,
    300 U.S. 379, 397-98 (1937). ................................................. 22

WSB Electric v. Curry,
    88 F.3d 788, 793-94 (CA 9 1996). ............................................. 19

v

1

**STATUTES**

2   28 USC §1367. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

3   29 USC §151. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

4   29 USC § 211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5   29 USC §2101(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

6   29 USC §218. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

7   41 USC §12111(5)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8   42 USC  § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9   42 USC §2000e(b)(15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10   Bus. & Prof. Code § 16000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11   Cal. Civil Code § 41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12   Civil Code § 3082-3214. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

13   Cal. Labor Code §1060. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14   Cal. Labor Code  §§1060-65. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15   Cal. Labor Code § 1064. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

16   Cal. Labor Code § 1174. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17   Cal. Labor Code § 1205(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18   Cal. Labor Code §2673.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

19   Cal. Labor Code § 2922. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

20   Gov. Code §36900. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21

22

23

24

25

26

27                                                         vi

## I.   INTRODUCTION

*Amici* thank this Court for allowing submission of this brief to provide the Court with background on the legal issues and background to Measure C.  The City's brief notes that regardless of the policy wisdom of this ordinance, it is a legally valid exercise of the City's powers under both California and federal law. *Amici* offer additional legal authorities to this effect.  Although the fact that the Emeryville Ordinance reflects compelling public policy would not be legally relevant under the deferential "rational basis" standard which likely applies here, *amici* in this brief offer economic and policy information so the Court may gain a more complete understanding of the context from which the legal issues arise.  Specifically, *amici* provide background on the growing movement by cities and states across the country to raise the minimum wage and protect workers against job losses; evidence of the inadequacy of the state and federal minimum wages in high-cost cities like Emeryville; and economic analyses of the impact of higher minimum wages nationally and in Emeryville. Low-income working families in Emeryville face real hardship in light of the region's high cost of living. Responding to this urgent need to protect the welfare of these vulnerable local residents, the City of Emeryville has joined a growing number of cities across the country in enacting an employment standards ordinance. Emeryville's decision is supported by the best economic evidence, even though under rational basis review, no evidence is needed.  According to recent economic research by respected experts on labor markets, higher minimum wages raise living standards for low-income workers without causing significant job losses or other adverse consequences.

## II.   STATEMENT OF FACTS

Voters in the City of Emeryville approved Measure C this past November. It went into effect on December 6, 2005. It addresses four related social problems: poverty from low wages, mass unemployment caused by turnover in management, juror shortages due to employers not providing paid leave for jury duty, and overworking of hotel room cleaners. It is focused on large hotels for reasons set forth in its Findings section, which in sum, consist of their ability to pay coupled with their inability (unlike manufacturers, for example) to respond to employment laws by moving to Nevada, China, etc.  The Measure requires large hotels to pay at least $9 per hour, consisting of either cash or cash plus health benefits. This should be

1

compared to the $13-14 required by the living wage ordinances in Oakland, Berkeley, and Richmond. (All these and other living wage ordinances allow health benefits to be counted towards the wage requirement). The low minimum here is counterbalanced in part by a requirement that each hotel's workforce overall average at least $11 per hour. This approach allows some persons to be hired at a lower rate (to preserve job opportunities for disabled and younger persons), while ensuring that most jobs pay wages sufficient to support families.

The Measure discourages overworking of room cleaners by requiring a wage rate of at least $16.50 per hour if they are required to clean more than 5000 square feet per day. Public health professionals find that hotel room cleaners are increasingly experiencing pain and sometimes permanent injuries from overwork, particularly at larger hotels.[1]

---

[1]Hotel workers have higher rates of occupational injury and illness than workers in the service sector as a whole.  In 2002, hotel workers had 6.7 occupational injuries and illnesses per 100 full-time workers, compared to 4.6 in the service sector as a whole. See U.S. Department of Labor, Bureau of Labor Statistics, Survey of Occupational Injuries and Illnesses, Table I ("Incidence rates of non-fatal occupational injuries and illnesses by industry and selected case types, 2002" (available at: http://www.bls.gov/iif/ oshwc/osh/os/ostb1244.pdf. ) Among maids and housekeeping cleaners, the largest category of injuries involve overexertion.  John J. Kane & Martin E. Personick, "Profiles in safety and health: hotels and motels", MONTHLY LABOR REVIEW, July 1993, at 40 (available at http://www.bls.gov/ opub/mlr/1993/07/art4full.pdf;). This is confirmed by the Bureau of Labor Statistics' Survey of Occupational Injuries and Illnesses, Table R12 ("Number of nonfatal occupational injuries and illnesses involving days away from work by occupation and selected events and exposures leading to injury or illness, 2003" at 35-36 (available at: http://stats.bls.gov/iif/oshwc/osh/case/ostb1390.pdf.). Injury rates are significantly higher at hotels with more than 50 employees than at hotels with fewer employees.  Kane & Personick, "Profiles in safety and health", supra, at 38. Peer reviewed academic studies indicate that the actual number of injuries faced by room attendants is significantly higher than is reported. Krause et al., "Physical Workload, Work Intensification, and Prevalence of Pain in Low Wage Workers: Results from a Participatory Research Project With Hotel Room Cleaners in Las Vegas", AMERICAN JOURNAL OF INDUSTRIAL MEDICINE (2005, in press), at 8; Krause et al., "Work-Related Pain and Injury and Barriers to Workers' Compensation Among Las Vegas Hotel Room Cleaners", AMERICAN JOURNAL OF PUBLIC HEALTH, 95:3 (March 2005), at 487. A peer reviewed academic study of injuries among room attendants in Las Vegas found that 60% of surveyed hotel room cleaners reported "severe or very severe" back pain during the past four weeks. Krause et al., "Physical Workload", supra, at 8.  Respondents reported an intensification of work in many of their assigned tasks and ergonomic problems associated with heavy linen carts and heavy bedspreads and comforters. Id. at 5.  The study found a strong, statistically significant relationship between reported bodily pain among room cleaners and  workload, work intensification and ergonomic problems. Id.

**BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ      CASE NO.  C06 1254**

1   As to enforcement, drafters addressed concerns about evasion through legal loopholes by making

2   the ordinance applicable to subcontracted employees and employees labeled as "independent contractors",

3   unless their work lasts less than four weeks. Sec. III.   Measure C authorizes the City to inspect payroll

4   records and ultimately revoke a hotel's permit for noncompliance; it also provides a private right of action

5   because the drafters understood that there are many other competing  priorities within City government.

6   Recognizing that workers would lack information about the ordinance, and likely fear retaliation for

7   asserting their rights, drafters included a provision allowing "reasonable access to [the] workforce inside the

8   Hotel to . . . any organization assisting employees in the hospitality industry . . . . solely for the purpose of

9   monitoring compliance with this Chapter and investigating Employee complaints of noncompliance." The

10  organization which drafters had in mind is the East Bay Alliance for A Sustainable Economy (EBASE)

11  which does not engage in union organizing, but rather is a group devoted to the living wage ordinance.

12  **III.   ARGUMENT**

13      A. MEASURE C DOES NOT VIOLATE EQUAL PROTECTION OR DUE PROCESS

14      1.     The Wage Requirements Reflect Compelling Public Policy and Hence Readily Meet the
                Rational Basis Test

15  The U.S. Supreme Court has repeatedly made clear that economic regulations like Measure C are

16  subject only to the deferential rational basis standard:

17      In areas of social and economic policy, a statutory classification that neither proceeds along suspect
        lines not infringes fundamental constitutional rights must be upheld against equal protection
18      challenge if there is any reasonable conceivable state of facts that could provide a rational basis for
        the classification. [citations omitted].  Where there are plausible reasons for Congress's actions, our
19      inquiry is at an end. [citations  omitted]

20  F.C.C v. Beach Communications, Inc., 508 U.S. 307, 313-314 (1993).  Under rational basis review, courts

21  will not require voters to justify their legislative-type decision with an evidentiary record:  "A legislative

22  choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by

23  evidence or empirical data." F.C.C, 508 U.S. at 316.[2]

24

25      [2]Accord Heller v. Doe, 509 U.S 320 (1993) ("A State . . . has no obligation to produce evidence
        to sustain the rationality of a statutory classification."); Central St. Univ. v. Amer. Assn of Univ. Profs.,
26      526 U.S. 124, 128 (1999)(upholding statute which took away teachers' right to bargain over workload,

27                                                    3

28  **BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ     CASE NO.  C06 1254**

While the City of Emeryville need not present hard evidence that Measure C addresses a real social problem in a manner likely to solve this problem, such evidence is in the public record. In Emeryville and many American communities, low-income working families are facing rising costs of basic necessities and a growing shortage of jobs that pay a living wage. Nationally, the costs of housing, healthcare and child care for working families have risen dramatically over the past twenty years. But pay levels for workers in the bottom half of the income distribution have been stagnant and, particularly for men, have actually eroded in real terms during much of the past three decades.[3]  The crisis of the working poor is even more pronounced in Emeryville, where working families face housing costs that are far above the national average and state average, and there is a dire shortage of affordable housing.[4]

One part of the problem is the low value of the federal minimum wage. Starting in the mid-1970's, Congress began to allow the real value of the federal minimum wage to erode substantially. If the 1968 federal minimum wage of $1.68 per hour had been updated to keep pace with inflation, it would be worth approximately $9.11 per hour today in 2006 dollars.[5]  Instead it stands at just $5.15 per hour - 43% less than its real value in 1968.  This decline has contributed to the ballooning of low-wage jobs in our economy, with roughly one-quarter of all jobs in the United States paying $8.50 per hour or less.[6]

In light of Congress' failure to act, local and state governments have increasingly found themselves

justified by State's lawyers as based on a concern that such bargaining could reduce classroom time, but no hard evidence).

[3]Lawrence Mishel, Jared Bernstein & Heather Boushey, THE STATE OF WORKING AMERICA, 2004-05, at 122 Table 2.6, 124 Table 2.7 (Economic Policy Institute 2005) (hereinafter "STATE OF WORKING AMERICA").

[4]The 2000 Census reports that the median house price in Emeryville was $161,600, whereas the U.S. median house price was $119,000, 26% less. The median Gross Rent in Emeryville was $985, while the U.S. median was $602, 39% less than Emeryville. Emeryville % of households where gross rent is over 35% of income was 36.2%, while the percentage of U.S. households with gross rent over 35% of income was only 29.5%.

[5]Adjusted for inflation using the U.S. Department of Labor's Consumer Price Index Calculator. See U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer Price Indices.

[6]THE STATE OF WORKING AMERICA, supra at 122 Table 2.6.

4

forced to step forward to help poor families support themselves by enacting more adequate wage protections. In recent years, fourteen states and over 100 cities and counties have established wage standards above the federal level.[7]

The first phase of recent local action to ameliorate wage standards started in 1994 when cities began enacting fairly narrow local ordinances that establish higher minimum wages just for businesses that receive contracts or tax breaks from a city government.  These ordinances have been called "living wage" laws to communicate that the higher wage level - typically between $12.00 and $14.00 an hour in California - is closer (though still not enough) to the wage needed to enable a low-income worker to meet basic needs or help sustain a family.  Over the past decade, more than 120 cities and counties have enacted such measures.[8]

More recently, cities have begun to expand their local wage ordinances beyond city contractors and direct aid recipients to cover other private sector employers.  Since 1993, more than seven cities across the United States have enacted citywide minimum wage laws, including Santa Fe, Albuquerque, Washington, D.C., San Francisco, Milwaukee, Madison, and New Orleans.[9]  These broader wage ordinances offer a way for cities to help more struggling families.  Because the cost of living can vary substantially in different communities in a state, city wage ordinances also offer communities a means of adjusting the minimum wage to the level appropriate for their locality.

City minimum wages are not new.  For more than a century, federal, state and local governments in the United States have shared concurrent responsibility for ensuring decent working and living standards

---

[7]See Jeff Chapman, <u>States Move on Minimum Wage:  Federal inaction forces states to raise wage floor to protect low-wage workers</u> (Economic Policy Institute, Issue Brief no. 195, June 11, 2003) (available at http://www.epinet.org).

[8]As of March 2005, a total of 123 cities and counties had adopted Ordinances.  <u>See</u> Association of Community Organizations for Reform Now (ACORN) Living Wage Resource Center, Living Wage Wins (available at http://www.livingwagecampaign.org).

[9] Madison and several other Wisconsin cities enacted city-wide minimum wages in 2004 and 2005. Subsequently, the Wisconsin legislature barred city minimum wage laws in exchange for raising the state minimum wage. W.S.A. 104.001. The New Orleans minimum wage was similarly blocked post-enactment by the Louisiana legislature.

5

for our nation's low-wage workforce.  For example, Baltimore had a city minimum wage ordinance as early as the 1960's.  <u>City of Baltimore v. Sitnick & Firey</u>, 255 A.2d 376 (Md. 1969).  Congress expressly recognized the existence of municipal wage regulation in the anti-preemption provision of the Fair Labor Standards Act, 29 USC §218. Some state minimum wage laws have also established higher minimum wages for certain cities, recognizing that higher costs of living in urban areas necessitate higher minimum wages to ensure that working families can support themselves.[10]  But particularly since Santa Fe enacted its citywide wage ordinance in 2003, more and more cities have chosen to enact such measures. This approach has proven particularly attractive to cities like Emeryville with tourism-based economies where service workers such as hotel room cleaners often struggle with high costs of living.

Important new research findings concerning the economic impact of minimum wage increases informed Emeryville's decision to enact the Ordinance and the national trend towards more robust regulations of wages at the local level; they indicate it is feasible to require many low-wage employers to pay higher minimum wages without causing significant negative effects such as job loss. This research began with the pioneering work of David Card and Alan Krueger, who are recognized internationally as the top economists doing statistical studies of labor markets. Card and Krueger's 1995 book, <u>Myth and Measurement:  The New Economics of the Minimum Wage</u> (Princeton University Press), and their related research has clarified that minimum wage increases do not necessarily lead employers to cut jobs, as some observers conventionally assumed.  For their research, Card was awarded the John Bates Clark award from the American Economics Association in 1995  the so-called "junior Nobel Prize" in economics.  Krueger is the leading scholar in the labor economics program at Princeton University, and Card heads a similar program at the University of California at Berkeley. When New Jersey raised its state minimum wage in 1992, while neighboring Pennsylvania did not, Card and Krueger examined the impact on fast food jobs,

---

[10]<u>See</u> State of Wisc. Dep't of Workforce Devel., Equal Rts. Div., Labor Standards Bur., Historical Resume of Minimum Wage Regulations in Wisconsin (1998) (between 1947 and 1967 Wisconsin state law mandated higher minimum wage for cities)(available at http://www.dwd.state.wi.us/dwd/ publications/236e/LS-39E-P.pdf).

BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ     CASE NO.  C06 1254

one of the nation's most low-wage and price-sensitive industries.  Their survey of employers found that the minimum wage increase resulted in no discernable reduction in employment at restaurants on the New Jersey side of the state line.[11]   Subsequent studies of other recent minimum wage increases, including research by Card and Krueger examining the impact of the 1991 and 1992 federal minimum wage increases have yielded similar findings.[12]

In a particularly relevant study, UC economists measured the impact of San Francisco's minimum wage ordinance, which was originally set at $8.50 per hour. (It is currently $8.82, and is scheduled to rise to $9.14 as of 1/1/07). Specifically, they analyzed economic data and conducted surveys of restaurant owners in San Francisco and surrounding cities, both before and after the minimum wage took effect. Their research found that the citywide minimum wage ordinance raised pay for tens of thousands of low-income workers without causing job losses. Their research found no reduction in staffing levels or hours worked at affected restaurants, nor any increase in the rate at which restaurants in the city closed.[13] These findings are striking since the San Francisco ordinance is more demanding than Emeryville's in that it immediately applied to all restaurants with more than 10 employees, even freestanding ones without a ready supply of overnight hotel

---

[11] See David Card & Alan Krueger, MYTH AND MEASUREMENT: THE NEW ECONOMICS OF THE MINIMUM WAGE (Princeton Univ. Press 1995) (hereinafter "MYTH AND MEASUREMENT"); David Card & Alan Krueger, Minimum Wages and Employment: A Case Study of the Fast-food Industry in New Jersey and Pennsylvania:  Reply, 90 Am. Econ. Rev. No. 5, 1397-1420 (Dec. 2000).

[12] See, e.g., David Card, Using Regional Variation in Wages to Measure the Effects of the Federal Minimum Wage, 46 INDUS. & LAB. REL. REV. 22-37 (1992); Jared Bernstein, Increasing the Minimum Wage: Don't Let the Slowdown Slow It Down (Economic Policy Institute, Issue Brief, June 11, 2001) (discussing the preceding research findings); Jared Bernstein & John Schmitt, Making Work Pay: The Impact of the 1996-97 Minimum Wage Increase (Economic Policy Institute 1998), discussed in William Spriggs & John Schmitt, The Minimum Wage, in RECLAIMING PROSPERITY: A BLUEPRINT FOR PROGRESSIVE REFORM (Todd Schafer & Jeff Faux eds., 1996); Robert Pollin, Stephanie Luce & Mark Brenner, Economic Analysis of the New Orleans Minimum Wage Proposal at 22-24 (Univ. of Mass. Political Econ. Research Inst., Research Report no. 1, 1999).

[13] See, e.g. Arindrajit Dube, Suresh Naidu & Michael Reich, "The Economic Effects of Citywide Wage Mandates: Evidence from the 2004 San Francisco Minimum Wage Increase," Working Paper, Institute of Industrial Relations, University of California Berkeley (2005).

**BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ     CASE NO.  C06 1254**

1  guests.

2  Such empirical research has prompted many leading American economists to adjust their view of

3  the economics of the minimum wage.[14]  For example, Nobel laureate Robert Solow of the Massachusetts

4  Institute of Technology explains, "The main thing about the research is that the evidence of job loss is weak.

5  And the fact that the evidence is weak suggests that the impact on jobs is small."[15]   Richard Freeman of

6  Harvard University, one of the country's foremost labor economists,  says that, contrary to the conventional

7  wisdom, "the entire literature on the minimum wage [now agrees] that employment losses are modest."[16]

8  Eminent Harvard economist, John Kenneth Galbraith, has commented even more pointedly, "That [an

9  adequate minimum wage] will diminish employment opportunity, the argument most commonly made in

10  opposition, may be dismissed out of hand, for that is, invariably, the special plea of those who do not wish

11  to pay the wage, and it is without empirical support."[17]  Given that there is little risk that higher wage floors

12  will cause unintended consequences, Measure C represents sound public policy that is more than rationally

13  related to the goal of increasing the number of living wage jobs in the Emeryville community.

14  The Hotels also challenge the Measure's requirement of an  $11 average wage, which operates in

15  concert with the $9 minimum wage requirement for every worker. This provision rests on the same rational

16  basis as the state regulations which allow employers to pay a lower wage to disabled individuals and learners

17  for their first four workweeks: there are some workers who need access to more entry-level-wage jobs, and

18

19  [14]Economists are continuing to assess how the higher labor costs associated with raising the

20  minimum wage are absorbed.  A portion of the labor costs appear to be passed on in the form of slightly higher consumer prices for services supplied by low-wage workers, while some of the costs appear to come out of modestly-trimmed employer profit margins.  See MYTH AND MEASUREMENT, supra.

21  [15]Quoted in Louis Uchitelle, A Pay Raise's Impact, N.Y. TIMES at D1 (Jan. 12, 1995).

22  [16]Quoted in J.W. Mason, Living Wage Junkonomics, CITY LIMITS (May 2002).

23

24  [17]John Kenneth Galbraith, THE GOOD SOCIETY 67 (1996).  Indeed, the former Republican Governor of Massachusetts, Paul Cellucci, "admitted that his prior belief - that increasing the minimum

25  wage would hurt the economy - was wrong. He changed his mind after witnessing the continued economic growth in Massachusetts following a previous minimum wage hike in the mid-1990's." Kraut,

26  Klinger & Collins, Choosing the High Road: Businesses that Pay a Living Wage & Prosper at 8 (Responsible Wealth 2000).

27  8

28  **BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ     CASE NO.  C06 1254**

1   whose personal circumstances might not necessitate being paid at the higher level needed to support a

2   family. Besides persons with formal disabilities and teenagers seeking their first jobs, this category may also

3   include senior citizens, mothers returning to the workforce after prolonged absence, ex-convicts, etc. The

4   drafters of Measure C realized it was impossible to catalogue all such exceptions while still preventing

5   displacement of workers with families to support. Instead the drafters adopted the more simplified approach

6   of an average wage requirement, which gives employers more flexibility than other possible approaches to

7   the same challenges. Far from being irrational, coupling the minimum wage with an average wage is sound

8   public policy.

9          2.      Regulating Only Large Hotels Meets the Rational Basis Test

10          The Equal Protection Clause does not require all businesses to be treated alike, and current equal

11   protection doctrine makes a government decision to regulate one business but not another "virtually

12   unreviewable." FCC v. Beach Commun., supra, 508 U.S. at 316. See also Viceroy Gold Corp. v. Aubry,

13   75 F.3d 482, 490-91 (CA 9 1996) (rejecting Equal Protection attack on state law treating mining employees

14   different from other industries, and treating union and non-union employees differently); Retail Industry

15   Leaders Ass'n v. Fielder, Civ. No. JFM-06-316, 2006 WL 2007654, at *15 (D. Md. July 19, 2006)

16   ("Wal-Mart does not contend that it is similarly situated to the plaintiffs in Romer and Cleburne, and the fact

17   that it is the only entity subject to the [Maryland statute mandating large for-profit employers provide health

18   benefits] is not itself sufficient to make out a viable equal protection claim.").  Judicial review is limited

19   because:

20          [t]he task of classifying people for benefits… inevitably requires that some persons who have an
            almost equally strong claim to favored treatment be placed on different sides of the line, and the
21          fact the line might have been drawn differently at some points is a matter for legislative, rather than
            judicial, consideration.
22
     United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 179 (1980).
23

24   Although low-wage employment is not unique to large hotels, "[i]t is no requirement of equal protection that

25   all evils of the same genus be eradicated or none at all."  Railway Express Agency v. New York, 336 U.S.

26   106, 110 (1949)(rejecting equal protection attack on local regulation which banned advertising on trucks as

27                                                  9

28   **BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ    CASE NO.  C06 1254**

too distracting but did not regulate other sources of distraction such as "the vivid displays on Times Square"). Thus, courts have upheld wage laws that, like Measure C, apply only to a narrow class of employers.  See, e.g., RUI v. City of Berkeley, 357 F.3d 1137, 1154-56 (CA 9 2004) (finding it "rational . . . for the City to treat larger Marina businesses differently from their competitors outside the Marina"); City of Baltimore v. Sitnick & Firey, 255 A.2d 376 (Md. 1969)(upholding local minimum wage ordinance which increased wages only for taverns).

As the Ninth Circuit recognized in ABC v. Nunn, supra, most employment legislation is not even close to being uniform in application: often small employers are exempted,[18] as are various industries. Legislative bodies have regularly written employment laws with an eye to ability-to-pay, and for this reason covered only specified regions, industries and employers.[19]  Several good reasons for selecting large hotels for wage regulation are expressed by Measure C in its Findings section and in the Notice of Intention to Circulate. Because these reasons are rational on their face, no further judicial inquiry is needed. However, there is more: published data shows the hotel industry pays  workers less than other industries but is quite profitable. See Request for Judicial Notice filed herewith.

---

[18]See, e.g., Worker Adjustment & Retraining Notification Act, 29 USC §2101(a)(100 employees required); Americans with Disabilities Act, 41 USC §12111(5)(A)(25 employees required); Title VII of the Civil Rights Act of 1964, 42 USC §2000e(b)(15 employees required). This selectivity follows in long tradition of labor legislation focused on industries perceived to represent more of an injustice. Even in the heyday of substantive due process, courts upheld such selectivity. See e.g., Holden v. Hardy, 169 U.S. 366, 395-96, 18 S.Ct. 383, 388 (1898)("The enactment does not profess to limit the hours of all workmen, but merely those who are employed in underground mines, or in the smelting, reduction, or refining of ores or metals. These employments, when too long pursued, the legislature has judged to be detrimental to the health of the employees; and, so long as there are reasonable grounds for believing that this is so, its decision upon this subject cannot be reviewed by the federal courts.").

[19]Measure C borrows its worker retention provisions from laws which apply only to certain industries such as janitorial and security businesses. See Labor Code  §§1060-65 (worker retention law for janitors). When the FLSA was enacted, it "was so burdened with exceptions for special industries and interests that [Congressman] Martin Dies was moved to offer up a satiric amendment stipulating that 'within 90 days after appointment of the Administrator, she (Labor Secretary Frances Perkins, presumably) shall report to the Congress whether anyone is subject to this bill." T.H. Watkins, The Great Depression: America in the 1930's (Little Brown 1990) at 314-15(emphasis supplied).

10

3.    There is a Rational Basis for Allowing Additional Flexibility to Collective Bargaining Parties

In <u>RUI v. Berkeley</u>, the Court also upheld the living wage ordinance provision that allows unions and employers to negotiate terms varying from the living wage requirement in collective bargaining agreements. 371 F.3d at 1156-57.   The validity of such an opt-out clause is well-settled.. <u>See</u>, <u>e.g</u>. <u>St. Thomas-St. John Hotel, Inc. v. Gov't of Virgin Islands</u>, 218 F.3d 232, 244-46 (CA 3 2000) (upholding statute requiring just cause for employee discharge but allowing union opt-outs); <u>Viceroy Gold</u>, 75 F.3d at 491 (upholding statute limiting mine workers to an 8-hour day unless otherwise provided in a collective bargaining agreement); <u>National Broadcasting Co v. Bradshaw</u>, 70 F.3d 69, 73 (CA 9 1995(upholding regulations requiring employers to pay double time for all hours worked over 12 unless employees covered by collective bargaining agreement).  As noted in <u>Viceroy Gold</u>, a legislative body can reasonably conclude that workers who have the strength of collective bargaining representation can deviate from certain minium standards yet negotiate an overall package equal to or superior to that which is required by law and thereby continue serving the same anti-poverty goals.  For example, a collective bargaining agreement could supplement wages with pension benefits that are not accounted for in most living wage laws, including Measure C, due to the general difficulty of measuring such benefits on a per-hour basis.  <u>See</u> <u>also</u> 29 USC §151 (noting unrepresented individual workers in weaker situation than workers with collective bargaining rights).

4.    A Workload Premium for Housekeepers Has a Rational Basis

Hotel housekeepers face a risk that employers will react to the higher wage floor by increasing their workloads, but housekeeper workloads are already at dangerous levels. Indeed, they have worsened in recent years, due to the industry's increasing reliance upon more luxurious in-room amenities that are more difficult to clean, such as heavier bed coverings, pillows, minibars, and metallic surfaces. Because housekeepers alone among hotel workers have work readily measured in terms of number of rooms and square feet, employers impose high-pressure productivity quotas on them more than other workers. <u>See</u> <u>Ill. Hotel Ass'n v. Ludwig</u>, Ill. Cir. Ct. Case No. 05CH13796 (July 28, 2006)(rejecting NLRA preemption and Equal Protection challenges to new law requiring rest breaks for hotel room cleaners)(copy attached hereto as App.

11

A). Thus, the premium pay provision concerning housekeeper workloads is rationally connected both to the living wage requirement, and also to the legitimate public policy goals of preventing worker exhaustion and injuries.

### 5. Worker Retention Readily Meets the Rational Basis Test

The worker retention provision protects society against suddenly having to deal with the aftereffects of mass terminations in this industry. The sale of a business is a situation where discrimination due to existing workers' greater age or higher compensation levels can readily occur, but such unfair discrimination is difficult or impossible to remedy under existing laws. Some employers base their hiring decisions in this situation on a general prejudice against existing workforces ("better to start with a clean slate" or "can't teach an old dog new tricks"). The ordinance ensures that workers are given a few weeks' opportunity to prove their worth and overcome employer prejudice. The reasonableness of such a goal is evinced by the fact that Federal and state plant closing laws are aimed at similar concerns. Measure C merely complements those laws in a manner that reflects local circumstances. The Emeryville ordinance results from a recognition that (1) many mass terminations in hotels would likely escape coverage by the WARN Act because fewer than 50 full-time jobs would be lost, or because the employer's total workforce is under 100 full-timers (29 USC §2101(a)), and (2) mere notice of layoffs is frequently insufficient to mitigate their negative impacts on workers and the community.

### 6. There Is A Rational Basis for the Enforcement Provisions

Because wage ordinance violations are not always properly recorded in payroll records, the workplace access provision enables living wage advocates to discover hidden violations by communicating directly with employees. Without workplace access, living wage advocates would have to try to find workers' home addresses and visit them there, which would be an inefficient use of resources, or stand outside hotels, which potentially could disturb customers. Enabling advocates to communicate directly with employees is necessary to ensure proper enforcement even assuming that the Hotels' payroll records would be complete and accurate, for the City may not always have the resources to thoroughly check them. Members of the public visit these Hotels' premises every day; a 5-minute visit from an employee rights advocate is not more

12

1   intrusive and therefore does not cause any serious injury to a hotel. In this industry, employees often take

2   breaks in restaurants and other areas already open to the public; if an advocate spends 5-10 minutes there

3   talking with workers on their break times while both are eating, such use of the premises is indistinguishable

4   from normal use. Requiring a hotel to allow such use does not infringe upon the hotel's rights in a manner

5   materially different from laws prohibiting discrimination in access against the disabled and many other

6   groups. Cal. Civil Code § 41.  These hotels are already subject to pervasive regulation which authorizes

7   access to non-public areas by outsiders such as health inspectors, ABC inspectors and DLSE investigators.

8   These hotels have liquor licenses, and liquor licensees operate within such a pervasively-regulated field that

9   the Fourth Amendment does not bar warrantless searches of their facilities. Colonnade Catering v. U.S., 397

10  US 72, 75-76 (1970). Of course, here there is not even a search: Measure C merely provides workers with

11  the opportunity to talk to someone about Measure C on their breaks if they wish. This protection does not

12  violate equal protection or due process.

13      Measure C's coverage of subcontractors is rationally designed to prevent employers from evading

14  the ordinance by splitting the workforce into a series of phony subcontractors (e.g., turning the chef into the

15  food service "contractor" and nominal employer of the other food service workers). Numerous statutes

16  similarly hold the ultimate source of economic power responsible for the wage obligations of those further

17  down the chain: see, e.g., Civil Code § 3082-3214 (mechanics lien laws making property owners liable for

18  the wage debts of their construction contractors and subcontractors); California Labor Code §2673.1

19  (making garment sellers responsible for the unpaid wages of their subcontractors), §1774-75 (making both

20  contractor and its subcontractors liable for prevailing wage compliance on public works).

21      **B.      MEASURE C IS NOT PREEMPTED BY FEDERAL LABOR LAWS**

22      1.      Measure C is Not Preempted by the Machinists Doctrine

23      The Fair Labor Standards Act expressly acknowledges the right of localities to impose higher

24  standards for workers (29 USC §218)[20] as does the federal WARN Act. 29 USC § 2105. The National Labor

25  _____

26      [20]This provides that none of the FLSA's provisions shall excuse "noncompliance with any Federal
    or State law or municipal ordinance establishing a minimum wage higher than the minimum wage

27                                                  13

1    Relations Act ("NLRA"), 29 U.S.C. §151 et seq., is solely addressed to the procedures of collective

2    bargaining and union organizing, and as explained below, the Supreme Court has drawn a clear distinction

3    between procedural and substantive regulation of employment conditions.

4        Because minimum standards laws "neither encourage or discourage the collective bargaining

5    processes that are the subject of the NLRA," Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S.

6    724, 755 (1985), under the Machinists preemption doctrine, the NLRA does not restrict the power of states

7    and localities to set minimum labor standards which affect only the terms and conditions of employment,

8    not the process of bargaining about them. Id. at 753-55. In concluding that Congress did not intend for the

9    NLRA to preempt the substantive employment law of the States, the Court also noted that the NLRA was

10   enacted against the backdrop of myriad state laws setting minimum labor standards. Met. Life, 471 U.S. at

11   755-56. Indeed, the earliest wage regulations were adopted not by the federal government, but by localities

12   and states. W. Nordlund, "A Brief History of the Fair Labor Standards Act", 39 Labor Law J. 715, 716-17

13   (1988)(noting that 14 states had enacted minimum wage laws by 1919, following the lead of Massachusetts

14   in 1912). Thus, "preemption should not be lightly inferred in this area since the establishment of labor

15   standards falls within the traditional police power of the state." Ft. Halifax Packing Co. v. Coyne, 482 U.S.

16   1, 21 (1987).

17       Measure C sets minimum labor standards of the sort approved by the Supreme Court against

18   preemption challenges in Met. Life, 471 U.S. at 753-58, Ft. Halifax, 482 U.S. at 21, and Livadas v.

19   Bradshaw, 512 U.S. 107 (1994).  In Metropolitan Life, the state required health insurance plans to have

20   certain mental health benefits. Although the content of the employees' health plan became a mix of what the

21   state law required and what the parties bargained for, the Court found that federal labor law did not preempt

22

23   established under this chapter or a maximum workweek lower than the maximum workweek established
     under this chapter...." See Rivera v. Division of Industrial Welfare, 265 Cal.App.2d 576, 602-605 (1968)

24   (holding no FLSA preemption of IWC regulation, noting Section 218  "so prominent as to foreclose any
     possibility of misapprehensions touching congressional intent" to preempt); Indus. Welfare Com. v.

25   Superior Court, 27 Cal.3d 690, 727, 729 (1980), cert. den. 449 U.S. 1029 (approving Rivera and
     recognizing FLSA authorizes states "to go beyond the federal legislation in adopting more protective

26   regulations for the benefit of employees.").

27                                                        14

28   **BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ    CASE NO.  C06 1254**

1    the state law. In <u>Ft. Halifax</u>, the Court held that Maine's plant-closing law was a minimum labor standard

2    and therefore not preempted by the NLRA, even though the Maine law had an explicit cognizance of the

3    collective bargaining process and provided that the statutory provisions could be superseded by a

4    collectively-bargained alternative. Similarly, in <u>Livadas</u>, the Court held that §301 of the Labor Management

5    Relations Act did not preempt claims under provisions of the California Labor Code requiring employers

6    to pay terminated employees at the time of discharge and providing penalties for delayed payment. These

7    three cases have eliminated any notion that local minimum standards are preempted under any branch of

8    federal labor law preemption analysis.

9         Nor does the NLRA preempt Measure C's worker retention provisions. As the City has noted, in

10   <u>Washington Service Contractors Ass'n v. District of Columbia</u>, 54 F.3d 811 (CADC 1995), cert den., 516

11   U.S. 1145 (1996), the court rejected an NLRA preemption challenge to a local worker retention ordinance

12   requiring new cleaning contractors to retain a majority of preceding contractor's workforce, even though this

13   allows unions to retain bargaining rights. The only courts to have considered this decision have agreed with

14   it: <u>Alcantara v. Allied Properties</u>, 334 F.Supp.2d 336 (EDNY 2004)(finding no federal labor preemption of

15   New York worker retention ordinance), and <u>St. Thomas-St. John Hotel Inc.</u>, <u>supra</u>, 218 F.3d at 244 (finding

16   no federal preemption of local law requiring that employers have just cause for discharge).

17        The Hotels argue that Measure C is preempted because allegedly motivated by a desire to unionize

18   the hotels' workforces. However, courts have refused to extend preemption doctrine to invalidate ordinances

19   that, like Measure C, are facially neutral about the bargaining process, solely on the basis of claims that they

20   were intended to help unions or have such effect, so long as the ordinances were facially neutral about the

21   bargaining process. <u>See</u> <u>Int'l Paper Co. v. Town of Jay</u>, 928 F.2d 480, 485 (CA 1 1996)(upholding against

22   NLRA preemption challenge an environmental ordinance enacted during a strike by a town council

23   comprised of strikers, where the employer argued legislators' true motive was to punish the employer for its

24   labor relations). As the court noted in <u>International Paper</u>, absent discrimination on the basis of race or other

25   protected category, "we will not strike down an otherwise constitutional statute on the basis of an alleged

26   illicit legislative motive.", quoting <u>U.S. v. O'Brien</u>, 391 U.S. 367, 383 (1968). <u>Accord</u> <u>RUI v. Berkeley</u>, 357

27                                                     15

F.3d at 1146 n. 7 ([T]hese facts [about union lobbying] are introduced solely to establish a supposed nefarious motive on behalf of the City Council. Such facts are wholly irrelevant, however, as our analysis of the constitutionality of an ordinance must proceed from the text of the ordinance, not the alleged motives behind it.[cite].); id. at 1155 (rejecting consideration of RUI's contention "that these were not the real reasons motivating the City Council's decision, but that the City Council was instead motivated by a desire to help in the unionization campaign at a Marina hotel [citing Town of Jay, supra).")[21]

Courts have regularly upheld local laws setting standards for private employers, only having trouble in one case, when a local law required payment of prevailing rates and set those rates solely by tracking the ever-changing course of collective bargaining agreements. Chamber of Commerce v. Bragdon, 64 F.3d 497, 504 (CA 9 1995). The Court emphasized that "the prevailing wage determined by the Director is not a fixed statutory or regulatory minimum wage, but one derived from the combined collective bargaining of third parties in a particular locality", and that the ordinance separately required prevailing wages and total prevailing compensation:

> if the employer and the workers have agreed to a total wage and benefit package that is equivalent to the total of the prevailing wage, but allocates more to benefits and less to direct wages, this would not comply with the Ordinance. [providing examples] The contractor, to comply, would have to pay an additional $2 in hourly wages for a total per diem rate of $17 or else seek to reduce the benefits to $3 per hour. This would place considerable pressure on the contractor and its employees to revise the labor agreement to reduce the benefit package and increase the hourly wages in order to remain competitive and obtain the contracts and jobs in Contra Costa County. It is clear that this Ordinance affects the bargaining process in a much more invasive and detailed fashion than the isolated statutory provisions of general application approved in Metropolitan Life and Fort Halifax.

Here, by contrast, (1) Measure C leaves it fully up to the employer and employees to determine how much money to spend on wages versus benefits[22], and (2) Measure C is not tied to ever-changing rates in labor

---

[21]Accord Legal Aid Society v. City of New York, 114 F. Supp. 2d 204, 237 (SDNY 2000) (rejecting NLRA preemption attack on agency's transfer of contract because of agency's hostility to union activities of contractor's workforce, holding motive irrelevant: "To accept the Union's contention would produce the anomalous result that the same action, undertaken by different state actors with different subjective motivations, would yield different results under NLRA preemption analysis." ).

[22]By noting this distinction between the facts in the instant case and those in Bragdon, *amici* do not concede that preemption can be found merely because a labor standards measure separately specifies the amount of wages and the amount of total compensation.

16

agreements, but rather sets objective minimums.  A collectively-bargained pay increase at unionized hotels will not change the rate Plaintiff Hotels have to pay under Measure C, unlike under the ordinance in Bragdon.  In Assoc'd Builders & Contractors v. Nunn, 356 F.3d 979, 990 (CA 9 2004), the Ninth Circuit clarified that Bragdon was a case premised solely on the fact that the ordinance tied wages to labor agreements which go up and down, rather than to an objective standard as in Measure C. Id. at 991 n.8 ("In invalidating Contra Costa County's prevailing wage ordinance, we carefully distinguished, for purposes of preemption, state-established minimum wage regulations, which we acknowledged to be lawful.").

The Ninth Circuit also made in clear in Nunn that a labor standard law may focus on a particular category of employees without giving rise to NLRA preemption concerns. In rejecting a preemption challenge to a state regulation impacting only construction employers on private work not paid for by the government, the court explained:

> [T]he NLRA does not authorize us to pre-empt minimum labor standards simply because they are applicable only to particular workers in a particular industry. [cites] It is now clear in this Circuit that state substantive labor standards, including minimum wages, are not invalid simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market.

Id. at 990.

It is also well-settled that federal labor law does not preempt provisions of ordinances and statutes which allow unionized employees to opt out of the statute. The Livadas decision endorsed such provisions:

> our holding that the Commissioner's unusual policy is irreconcilable with the structure and purposes of the Act should cast no shadow on the validity of these familiar and narrowly drawn opt-out provisions. [FN26]
> FN26. Nor does it seem plausible to suggest that Congress meant to pre-empt such opt-out laws, as "burdening" the statutory right of employees not to join unions by denying nonrepresented employees the "benefit" of being able to "contract out" of such standards. Cf. Addendum B to Brief for Employers Group as Amicus Curiae (collecting state statutes containing similar provisions).

Livadas, 532 U.S. at 132.  See also Section III.A.3, supra discussing St. Thomas Hotel, supra, 218 F.3d at 245-6; Viceroy Gold, supra, 75 F.3d at 490; NBC v. Bradshaw, supra, 70 F.3d at 73.

Finally, there is no federal preemption of local and state laws providing access to labor organizations, as the Ninth Circuit explained in NLRB v. Calkins, 187 F.3d 1080 (CA 9 1999):

> We find no reason to believe that California's provision of additional access conflicts with the federal scheme. As one prescient commentator noted: 'If states choose to modify their property laws, and

17

1    to subtract from the owner's bundle of property entitlements, the federal interest in access then
2    pushes against an open door. There is no federal justification for barring states from allowing access
     when the only reason federal law did not provide the access was a deference to supposed state law
3    opposing it.' [cite]. This analysis fully accords with NLRA preemption principles. [cites]

4    Id. at 1095.  Thus, Measure C does not interfere with the collective bargaining process and is not preempted

5    under the Machinists doctrine.

6           2.      The Garmon Doctrine Does Not Preempt Any Provision of Measure C

7           In San Diego Building Trades v. Garmon, 359 U.S. 236 (1959), the Court held that the NLRA

8    preempts state or local regulation of conduct which is arguably prohibited or arguably protected by the

9    NLRA.  This Court lacks jurisdiction to consider the Garmon issue because that simply represents a defense

10   in state court, not a basis for a federal court claim. In Golden State Transit Corp. v. City of Los Angeles (II),

11   493 U.S. 103 (1989), the Court held that a Machinists claim could be pursued under 42 USC § 1983, but

12   not a Garmon claim:

13
14          Respondent argues that the Supremacy Clause, of its own force, does not create rights enforceable
            under § 1983. We agree."[T]hat clause is not a source of any federal rights"; it " 'secure [s]' federal
15          rights by according them priority whenever they come in conflict with state law." [cites] * * * The
            Machinists rule is not designed - as is the Garmon rule - to answer  the question whether state or
            federal regulations should apply to certain conduct. Rather, it is more akin to a rule that denies either
16          sovereign the authority to abridge a personal liberty.

17   Id. at 107-112.  See also Etheridge v. Harbor House Restaurant, 861 F.2d 1389 (CA 9 1988)(finding no

18   federal removal jurisdiction under Garmon, explaining it is a doctrine about NLRB jurisdiction, not

19   substantive law, which must be left to state courts to decide).

20          However, if somehow this Court has jurisdiction to decide the Garmon claim here, the Ninth Circuit

21   decisions discussed above all rejected Garmon preemption attacks on state labor standards, even those with

22   union opt-out provisions.  Similarly, Garmon was held inapplicable to wage requirements in Dillingham

23   Const.  v. County of Sonoma, 190 F.3d 1034 (CA 9 1999).  As Calkins, supra, makes clear, Garmon is not

24   implicated by Measure C's provision which theoretically might allow unions access to a hotel breakroom.

25   Neither such access (nor an employer's trespass suit in response) is conduct arguably protected by the NLRA

26   nor arguably prohibited by the NLRA. The Supreme Court has made clear that non-employees have no

27                                                  18

28

1   access rights under the NLRA. <u>Lechmere, Inc. v. NLRB</u>, 502 U.S. 527, 532 (1992)("by its plain terms the

2   NLRA confers rights only on employees, not on unions or their nonemployee organizers."); <u>Sparks Nugget,</u>

3   <u>Inc. v. N.L.R.B.</u>, 968 F.2d 991, 997 (CA 9 1992)(applying this to hotels). Just as it is now clear that

4   non-employee organizers have no NLRA rights, it is equally clear that the NLRA creates no rights in

5   employers to bar organizers: such right exists, if at all, under state and local laws.

6          3.      <u>Measure C Is Not Preempted by ERISA</u>

7          Measure C easily avoids ERISA preemption by not requiring that an ERISA plan be provided, but

8   simply counting any plan contributions toward the minimum compensation level required. The Measure was

9   designed to follow <u>WSB Electric v. Curry</u>, 88 F.3d 788, 793-94 (CA 9 1996), which upheld state prevailing

10  wage laws under which ERISA benefits counted towards total compensation required:

11

12          The references to ERISA plans in the California prevailing wage law have no effect on any ERISA
            plans, but simply take them into account when calculating the cash wage that must be paid. At most,
            this scheme provides examples of the types of employer contributions to benefits that are included
13          in the wage calculation. The scheme does not force employers to provide any particular employee
            benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits
14          at all.).

15  All circuits to consider this issue have upheld this kind of compensation requirement.  <u>Burgio v. N.Y.S.</u>

16  <u>Dep't of Labor</u>, 107 F.3d 1000 (CA 2 1997); <u>Minnesota Chapter of Associated Builders and Contractors, Inc.</u>

17  <u>v. Minnesota Department of Labor and Industry</u>, 47 F.3d 975 (CA 8 1995); <u>Keystone Chapter, Ass'd</u>

18  <u>Builders & Contractors Inc. v. Foley</u>, 37 F.3d 945 (CA 3 1994), cert. den., 115 S. Ct. 1393 (1995).

19         Because the <u>Baca</u> decision cited by the Hotels involved an ordinance mandating a certain amount

20  of benefits, and because <u>Baca</u> predated <u>Curry</u>, <u>Baca</u> is not properly relied on here. Other recent decisions

21  support applying <u>Curry</u> here: in <u>Cal. Div. Lab. Standards Enft. v. Dillingham</u>, 519 US 316 (1997), the Court

22  held it was permissible for states and localities to economically press employers to provide certain benefits,

23  as long as there was no requirement an ERISA plan be provided. The Court noted that apprenticeship

24  programs (like the wages called for here) could be paid out of an employer's general assets without having

25  an ERISA plan: "an employee benefit program not funded through a separate fund is not an ERISA plan."

26  The Court also noted the strong economic incentive given by California's law for non-union employers to

27                                                19

1   revise their ERISA plans was insufficient to find this law preempted:  "the apprenticeship portion of the

2   prevailing wage statute does not bind ERISA plans to anything." Id. at 332.

3        Minimum labor standards are not preempted by ERISA, even when they encourage employers to

4   provide benefit plans. Ft. Halifax, supra  (upholding Maine severance pay statute);  Alaska Airlines v.

5   Oregon Bureau of Labor, 122 F.3d 812 (CA 9  1997)(upholding state leave statute). So too here, even if

6   Measure C gives employers some incentive to expand ERISA health plans, they could readily meet their

7   duties through non-ERISA means: that is, out of their general assets.  See also  Keystone, supra, 37 F.3d at

8   960 ("Where a legal requirement may be easily satisfied through means unconnected to ERISA plans, and

9   only relates to ERISA plans at the election of the employer, it 'affects employee welfare benefit plans in too

10   tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.'").

11   **C.  MEASURE C IS NOT UNCONSTITUTIONALLY VAGUE**

12        "In order to succeed on a facial vagueness challenge to a legislative measure that does not threaten

13   constitutionally protected conduct ... a party must do more than identify some instances in which the

14   application of the statute may be uncertain or ambiguous; he must demonstrate that 'the law is impermissibly

15   vague in all of its applications.' (Hoffman Estates v. Flipside, Hoffman Estates (1982) 455 U.S. 489, 497

16   . . ."; Evangelatos v. Sup. Ct., 44 Cal.3d 1188, 1201 (1988).  Courts do not require scientific precision in

17   drafting of ordinances lacking criminal penalties, recognizing that judicial and administrative interpretations

18   help eliminate vagueness:

19        "Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any
     reasonable and practical construction can be given its language." [Citation.] It will be upheld if its

20        terms may be made reasonably certain by reference to other definable sources [citation].' [Citation.]
     Moreover, courts have a duty to ' "construe enactments to give specific content to terms that might

21        otherwise be unconstitutionally vague." ' [Citation.] 'If feasible within bounds set by their words and
     purpose, statutes should be construed to preserve their constitutionality.' " [cite] Furthermore, "

22        '[C]ontemporaneous administrative construction of a statute by an administrative agency charged
     with its enforcement and interpretation is entitled to great weight unless it is clearly erroneous or

23        unauthorized.' [Citation.]" [cite]

24   Mason v. Office of Administrative Hearings,  89 Cal.App.4th 1119, 1126-27 (2001).[23]

25   

26       [23]See also Duskin v. State Board of Dry Cleaners, 58 Cal. 2d 155 (1962)(upholding statute
allowing board to require bond from applicant if it determined that " 'the financial responsibility of an

27

28   **BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ     CASE NO.  C06 1254**

"[W]here the language of a statute fails to provide an objective standard by which conduct can be judged, the required specificity may nonetheless be provided by the common knowledge and understanding of members of the particular vocation or profession to which the statute applies." Cranston v. City of Richmond, 40 Cal.3d 755, 765 (1985). Here, the hotel industry is familiar with the terms used in Measure C. Measure C borrows many of its provisions from state law and ordinances elsewhere which thus will guide its interpretation. The vaguest provision is the one for "reasonable access to its workforce inside the Hotel . . . [to] be used solely for the purpose of monitoring compliance with this Chapter and investigating employee complaints of noncompliance". It is phrased this broadly because each hotel is laid out differently, and the need for visitation varies with the number and severity of worker complaints. The nature of these problems are such that they do not lend themselves readily to bright-line rules.[24] It is well-established that reasonableness is a constitutionally-permissible standard, even where criminal penalties attach and hence judicial review standards are stricter than here. People v. Linwood, 105 Cal.App.4th 59, 67-68 (2003)("Linwood unpersuasively contends section 261, subdivision (a)(3) is void for vagueness principally because of the disjunctive "reasonably should have been known" language. The concept of reasonableness in criminal statutes is not new." [citing six decisions upholding such a standard in various contexts]).

### D.  MEASURE C IS NOT PREEMPTED BY STATE LAWS

As the federal claims are meritless, this Court should decline to decide the state claims. 28 USC

---

applicant or licensee is questionable"); Katz v. Department of Motor Vehicles, 32 Cal.App.3d 679, 684 (1973)(upholding statute allowing DMV to refuse issuance of license plates that "may carry connotations offensive to good taste and decency."); Sunset Amusement Co. v. Board of Police Commissioners, 7 Cal.3d 64, 71-72 (1973)(upholds code provision giving board authority to deny a permit for roller skating rink if operations "would not comport with the 'peace, health, safety, convenience, good morals, and general welfare of the public.'); In re Marks, 71 Cal.2d 31, 51 (1969)(upholding statute giving agency authority to return narcotics addicts to rehabilitation centers when it would be "for the best interests of the person and society").

[24]If dozens of workers are unaware of what the ordinance requires and want to talk to the group, then it would be silly to have a law saying it can only have 15 minutes access per week; however, if there are no such complaints and workers have already been educated, that amount of time would be adequate. A fixed formula that is adequate for workers' needs in all situations is impossible to write in advance.

§1367; <u>Cedar Shake Bureau v. City of Los Angeles</u>, 997 F.2d 620 (CA 9 1993)(district court should not have adjudicated claim of state law preemption).  However, if this Court exercises its discretion to address the state claims, it must start with Labor Code § 1205(b) which provides: "Nothing in this part [Labor Code sections 1171-1205, providing for minimum pay rates and IWC authority] shall be deemed to restrict the exercise of local police powers in a more stringent manner." This legislative acknowledgment of local wage-setting power stems from settled law that localities have police powers to set employment standards. In Attorney General Opinion No. 89-502 (1/18/90), the California Attorney General confirmed that regulating private sector wages was within localities' general police power given localities. <u>See</u> <u>also</u> <u>West Coast Hotel Co. v. Parrish</u>, 300 U.S. 379, 397-98 (1937) (setting of wage standards a valid exercise of police power). Bus. & Prof. Code § 16000 and Gov. Code §36900 recognize that cities can license businesses for regulatory purposes and create private rights of action.

In evaluating whether a local ordinance is preempted by state law, the courts have developed the following principles: where local legislation "(1) duplicates, (2) contradicts, or (3) enters an area fully occupied by general law, either expressly or by legislative implication." <u>Candid Enterprises v. Grossmont Union High School District</u>, 39 Cal.3d 878, 885 (1985). There is no "duplication" here, and the fact that more demanding employment standards are set does not represent "contradiction" (as federal and state legislators recognize in the statutes cited above). The existence of a large number of state laws touching on the same subject is not enough to preempt local action. Thus a court recently upheld an L.A. County ordinance mandating pay for leave for jury duty, in so doing holding that the fact that many state laws addressed leaves (including requiring employers to allow workers time off for jury duty) was insufficient grounds for finding the Legislature intended preemption. <u>Burns Int. Sec. Svcs. Corp. v. County of L.A.</u>, 123 Cal.App.4th 162, 174-75 (2004). This L.A. ordinance was copied in Measure C's section I(D).

Courts "will be reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another." <u>Fisher v. City of Berkeley</u>, 37 Cal.3d 644, 707 (1984). <u>Accord</u>, <u>Great Western Shows, Inc. v. County of Los Angeles</u>, 27 Cal.4th 853, 866 (2002)(rejecting preemption claim). Here, localities have significant interests

22

that may differ from one to another, as they differ immensely as to their cost-of-living and their employers' ability to afford labor standards (clearly the cost of decent housing near Emeryville is higher than in the Central Valley, whereas Emeryville hotels have tourist attractions nearby and hence are in a better position than Valley hotels to afford living wages and workload premiums). Also, local markets are far different in terms of the frequency with which hotels are sold and hotel workers face mass displacement.

No court has ever held Labor Code § 2922 (the presumption of at-will employment) to be preemptive of local legislation. The Legislature has not viewed that section as preemptive but rather in 2000 assumed that localities had the power to enact ordinances providing for greater job security. That year the Legislature enacted a worker retention law for janitors (Labor Code §1060 et seq), including the following provision:"Nothing in this chapter shall prohibit a local government agency from enacting ordinances relating to displaced janitors that impose greater standards than, or establish additional enforcement provisions to, those prescribed by this chapter." Labor Code § 1064. That provision would make no sense if Labor Code § 2922 precluded localities from acting in this field. Worker retention ordinances were adopted by the Cities of San Francisco, San Jose, Oakland and Los Angeles. "Many local governments have enacted their own laws that prohibit certain kinds of discrimination in employment", such as HIV/AIDS status. See Bogue et al Advising California Employers (CEB 2006) § 15.50 at p. 1232.  Given all this, the Court cannot predict that state courts would find § 2922 preemptive of local employment protection ordinances. California courts have long recognized that public policies trump § 2922 which merely represents an evidentiary presumption:  "This section establishes a presumption of at-will employment that may be overcome by evidence of express or implied contractual limitations on the right of discharge or limitations imposed by public policy. [cites]." Semore v. Pool, 217 Cal.App.3d 1087, 1095 (1990).[25]

---

[25]Nor is the access provision preempted by state law. "[T]respass has long been an area in which local units have legislated; such an area may involve special local problems of facilities and geography with which a state Legislature could cope only with difficulty." In re Cox, 3 Cal.3d 205, 220 (1970). See also Batiste v. Superior Court, 4 Cal.App.4th 460 (1993)(local ordinance on trespass not preempted by state trespass laws).

BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ     CASE NO.  C06 1254

**E.  MEASURE C DOES NOT VIOLATE PRIVACY RIGHTS IN JOINING OTHER LABOR LEGISLATION IN PROVIDING OFFICIALS WITH PAYROLL ACCESS**

There is no unreasonable invasion of privacy in Measure C joining other labor laws in providing public officials with a right of access to payroll information. See FLSA  § 11 (29 USC § 211); Cal. Labor Code § 1174.  For labor standards law to fail to include such an inspection provision would render the standard ineffectual, for then the sole enforcement mechanism becomes employees somehow learning exactly what the standard is and having the courage to risk retaliation by reporting violations. Measure C does not give the public access to payroll information, nor would any other provision of state law provide citizens with automatic access: (1) the City is under no obligation to retain the payroll records once it has reviewed them; (2) the City would likely reject on privacy grounds any request from a citizen for personally-identifiable information.  The mere hypothetical possibility of an erroneous disclosure by city officials is not grounds for facial challenge to an ordinance, but rather presents an issue which can be addressed at later date  if and when someone makes a records request of the City. Directly on point is Gilbert v. City of San Jose, 115 Cal. App.4th 606 (2003)(rejecting facial challenge to ordinance requiring gaming employees supply personal information to City, with court instead simply requiring City in administering ordinance to alert these employees if a citizen sought to copy city file about them). See also Teamsters Local 856 v. Priceless, LLC, 112 Cal.App.4th 1500 (2003)(employees' group gets preliminary injunction to preclude city from disclosing individualized pay data to newspaper).

**F.   THERE IS NO NEED FOR DISCOVERY HERE**

The Hotels should not be allowed to forestall summary judgment by claiming a need for discovery. The most discovery could show is something about the motives of Measure C supporters, but legislation cannot be rendered irrational by its supporters' motives.  In addition to the cases cited above, see also City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 377, 111 S. Ct. 1344, 1352 (1991):

> The situation would not be better, but arguably even worse, if the courts were to apply a subjective test: not whether the action was in the public interest, but whether the officials involved thought it to be so. This would require the sort of deconstruction of the governmental process and probing of the official "intent" that we have consistently sought to avoid. *** [6] We have proceeded otherwise only in the "very limited and well-defined class of cases where the very nature of the constitutional

**BRIEF OF *AMICI* IN SUPPORT OF CITY OF EMERYVILLE'S MOTION FOR SJ    CASE NO.  C06 1254**

1    inquiry requires [this] inquiry." [citing race discrimination and bill of attainder cases]).[26]

2    **IV.    CONCLUSION**

3            This Court should grant summary judgment to the City.

4

5    Dated:   October 17, 2006              Respectfully submitted,

6                                           BRENNAN CENTER FOR JUSTICE
                                               AT NYU SCHOOL OF LAW
7
                                           Paul K. Sonn
8                                          Jennifer Sung

9
                                           DAVIS, COWELL & BOWE, LLP
10

11                                         By: s/s Andrew J. Kahn _____

12                                         Attorneys for *Amici*

13

14

15

16    _____

17    [26]State court decisions are in accord.  As early as 1855, the Chief Justice of the California
Supreme Court stated in an opinion: "I know of no authority this Court possesses to inquire into the
18    motives of the Legislature in the passage of any law; on the contrary, it has been uniformly held, that
they could not be inquired into." People v. Bigler, 5 Cal. 23, 26 (1855).  The rule barring judicial inquiry
19    into legislative motives applies equally to local legislation. Nickerson v. San Bernardino, 179 Cal. 518,
522-524, 177 P. 465 (1918).  See County of Los Angeles v. Superior Court of Los Angeles County, 13
20    Cal.3d 721, 726, 532 P.2d 495 (1975)(court cannot inquire into local legislators' motivation; even
discovery on this is impermissible); City of Santa Cruz v. Superior Ct., 40 Cal. App. 4th 1146
21    (1995)(same rule bars discovery of non-legislators); Goebel v. Elliott, 35 P.2d 44, 45 (Wash.
1934)(rejecting inquiry into motive of city council in enacting wage ordinance at request of union).
22    While this caselaw means a court should never get to the merits of the Hotels' unionization argument, it
also is not clear that raising employment standards benefits unions: why should workers bother to
23    unionize to get better pay if instead the government will do this for them? For this reason organized
labor for many years opposed all minimum wage legislation. See Watkins, supra. Those sympathetic to
24    unions still urge them to oppose such laws. See, e.g., Profs. Deitsch & Dilts, "Gompersonian
Organizational Principles: The Summer of Labor Discontent", Labor Law Journal 83, 88
25    (2006)("Political involvement leading to the provision of union-like benefits makes union membership
obsolete.")
26

27                                           25

28